MEMORANDUM OF DECISION
This memorandum of decision addresses a petition brought to terminate the parental rights (TPR) of April E., the biological mother of Crystal E. The Department of Children and Families (DCF) filed the present TPR petition against April E. on May 16, 2000, alleging the grounds of failure to rehabilitate and lack of an on-going parent-child relationship. For the reasons stated below, the court finds this matter in favor of the petitioner.
The file reflects that DCF obtained custody of Crystal[2] through an Order of Temporary Custody (OTC) entered on April 3, 1997, upon allegations that the child was in immediate physical danger from her surroundings and that immediate removal therefrom was necessary to insure her safety. On September 22, 1997, after hearing, the court found Crystal to be neglected and uncared for, and committed her to DCF's custody. The child has been maintained in DCF custody since that date, pursuant to orders of the court.
The file also reflects that on August 26, 1998, DCF had filed a previous TPR petition against April E. and Francisco R., Crystal's biological father. Also alleging grounds of failure to rehabilitate and lack of an on-going parent-child relationship, that matter was tried over the course of six days in early 1999. On April 27, 1999, the court (Munro, J.) issued a decision denying the TPR petition as to April E. and finding that DCF had failed to make reasonable efforts to reunify this respondent with her daughter, but terminating Francisco R.'s parental rights.[3] Subsequently, DCF filed the pending TPR petition against April E.
Trial of this highly contested matter took place on divers dates in March, May, June, and July 2001. The petitioner, April E. and the child[4] were vigorously represented throughout the detailed CT Page 16263 and exhaustive direct and cross examination of numerous witnesses, the admission of voluminous written materials, and the proffer of transcripts from multiple portions of the 1999 TPR trial. On or before August 14, 2001, the GAL and all counsel filed thorough, comprehensive, and insightful post-hearing reports and/or briefs, which presented numerous helpful references to the current and 1999 proceedings.
The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over this matter. Notice of the TPR proceeding was provided in accordance with the applicable Practice Book provisions. No action is pending in any other court affecting custody of the child.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR social studies,[5] and the other documents submitted in evidence which included multiple transcripts;[6] photographs, cards and drawings written or generated by April E.; educational records; reports from the Department of Corrections (DOC); alterative to incarceration records; records of conviction; DCF treatment plans, narrative summaries, notes, administrative hearing reports and visitation logs; hospital records; psychological and treatment provider reports; employment records; correspondence from counsel and DCF; laboratory reports; police reports and warrant affidavits; and memoranda of court hearings. The court has utilized the applicable legal standards[7] in considering this evidence and the testimony of trial witnesses, who included four psychologists, an alternative to incarceration counselor, police officers, DOC employees, therapists, visitation supervisors, substance abuse treatment providers, DCF staff members, April E.'s former landlord, her employment supervisor, and the respondent herself. Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial:
 I. A. EVENTS PRIOR TO THE ISSUANCE OF THE APRIL 27, 1999 TPR DECISION[8]
April E. was born on April 22, 1977. Abused by her mother, she engaged in delinquent acts as a child. April E. was placed in four separate foster homes, and left school after ninth grade. (Exhibits 3, 5a, 18.) She has worked as a cashier, waitress and hostess, and has also had long periods of unemployment. (Exhibits 3, 5a, 21.)
As a teenager, April E. was abused by her live-in boyfriend. (Testimony of Christine R., April E.) She first used alcohol and marijuana in early adolescence. April E. has a history of becoming aggressive and engaging in criminal activity "when she `got high' on marijuana."[9] "[T]he CT Page 16264 police have been to every house in which she has lived because of loud parties, fights between gang members, and being identified as a participant in such violence." (Exhibit 21.)
Crystal was born to April E. and Francisco R. on October 1996. During the child's early years, April E. was frequently connected to situations which involved violence or required police intervention. During her pregnancy with Crystal, April E. was stabbed by the child's father. (Exhibit UUU.) In February 1997, when Crystal was approximately four months old, police responded to a stabbing that occurred at her residence. (Exhibit 7; Testimony of April E.) In both, March and June 1997, April E. was the victim of assaults. (Exhibits 10, 11; Testimony of Gary F.) In March 1997, April E. was arrested and charged with disorderly conduct after an incident at her maternal grandparents' home.[10]
(Exhibit 8.) In May 1997, April E. was charged with larceny and assault. (Exhibit 9.)
DCF became involved with Crystal on February 12, 1997, following the stabbing incident at April E.'s home. Although April E. voluntarily placed her daughter with the child's maternal great-grandparents, Crystal thereafter came into DCF care through a ninety-six hour hold invoked on April 1, 1997, and an Order of Temporary Custody (OTC) entered on April 3, 1997. (Peck, J.) (Exhibits 35, VVV; Testimony of Roxanne D. 3/15/99.) On April 10, 1997, the court (Peck, J.) imposed the first of a long series of reasonable expectations and specific steps which were directed at reunifying mother and daughter. The initial expectations required that April E. secure/maintain adequate housing in lieu of her then-unstable or inappropriate living arrangements; secure/maintain lawful income; keep all DCF appointments and advise the agency of her whereabouts; participate in individual, domestic violence and substance abuse counseling; refrain from substance abuse and further involvement with the criminal justice system. (Exhibit 12.) On September 22, 1997, Crystal was adjudicated a neglected child[11] (Peck, J.) and was committed to DCF custody. (Exhibit M.) On that date, the court imposed a second set of expectations which reiterated the conditions set in April and added obligations to address other identified reunification issues. Thus, April E. was required to visit Crystal as often as DCF permits; participate in parenting counseling and sign releases as requested; avoid gang involvement and/or association with known gang members; comply with drug testing; and inform DCF of her whereabouts. (Exhibit 13.)
On October 3, 1997, April E. received a sentence of one year to serve, suspended, with two years of probation. Probation conditions mandated attendance at the Day Incarceration Center in Hartford (DIC), where she participated in an anger management course, and was offered substance abuse and life skills groups. However, notwithstanding the court's CT Page 16265 order, April E. failed to follow DIC's reasonable regulations, and was terminated from that program prior to completing the designated period of compliance. As a result, April E. was charged with a violation of probation while the steps were in effect. (Exhibits 20, 24, A, B; Testimony of Ronald G., Timothy K. 3/15/99.)
On August 14, 1998, the court (Harleston, J.) imposed a third set of reunification expectations upon the respondent mother. These expectations largely reiterated the prior obligations, and expressly restated that April E. should have no involvement with drug users, drug dealers, or the criminal justice system. (Exhibit 14.)
On October 12, 1998, April E. gave birth to Anthony E. and Alexander E. (the twins). Although DCF originally imposed a 96-hour hold upon them, the twins were returned to April E.'s care on October 30, 1998.[12]
(Exhibits 6, 30.)
In November 1998, a hospital-based program found that April E. was not in need of substance abuse treatment. (Exhibits 17, TT.)
On December 10, 1998, the court (Harleston, J.) imposed a fourth set of reunification criteria for April E. These steps reinforced prior expectations for the respondent's reunification with Crystal and specifically required her to participate in parenting and individual counseling at a local hospital and family preservation program "to focus on issues to help mother better parent her children. To address issues of anger management." (Respondent Mother's Trial Brief in Opposition to Termination of Parental Rights Petition, dated August 13, 2001.)[13] In addition, the December 1998 steps required that April E. "[s]uccessfully complete substance abuse treatment including inpatient treatment if necessary and follow recommendations regarding aftercare treatment, including relapse prevention . . . [and] sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, or for use in future proceedings before this court." (Mother's Trial Brief.) For the fourth time April E. was instructed, through the steps, that she was prohibited from having any further involvement with the criminal justice system. (Mother's Trial Brief.)
On two occasions in January 1999, while the twins were in her custody, while the specific steps prohibiting criminal involvement were in effect, and while she was subject to orders of probation, April E. sold marijuana to an undercover police officer at her residence in Vernon.[14]
(Testimony of David O., April E., Matthew G., Timothy K. 3/15/99.)
In late 1998, Kelly Rogers, Ph.D. performed a court-ordered CT Page 16266 psychological evaluation of April E. and observed her interaction with Crystal.[15] (Exhibit 3.) Upon his recommendation that April E. undergo psychotherapy, in February 1999, DCF referred her to the Institute of Living (IOL) where pertinent treatment was available. (Testimony of Gloria T., Donyale P. 3/19/99.) April E. declined to attend psychotherapy at the IOL. However, in March 1999 she arranged for counseling with Christine R., a licensed clinical social worker-therapist of her own choosing. (Exhibit MMM, Testimony of Christine R., Gloria T.)[16] In April 1999, April E. earned a certificate for completion of a hospital-based parenting course. (Exhibit K.)
On April 27, 1999, after trial, the court (Munro, J.) issued its decision on TPR petitions that had been brought against April E. and Crystal's father. (Exhibit M.) The court ordered termination of the respondent father's parental rights. Finding that DCF had not made reasonable efforts to reunify April E. and Crystal, the court denied the petition as to the respondent mother, and ordered enhanced reunification efforts. It is uncontroverted that, in reaching her determination, Judge Munro had not been provided with evidence relating to April E.'s involvement in the drug sales that took place in January 1999, just prior to the commencement of the first TPR trial.
 I. B. EVENTS BETWEEN THE APRIL 1999 TPR DECISION AND THE FILING OF THE TPR PETITION ON MAY 16, 2000
In May 1999, DCF began extending intensive reunification services to April E., in compliance with the court's order. April E. agreed to participate in twice-weekly supervised visitation and individual parenting education sessions at AMPS; twice weekly DCF-supervised visitation at her home with integrated parenting-education services; and use of KidSafe visitation monitors, who also served as parenting educators during sessions. (Testimony of Gloria T.) DCF also tendered the opportunity for an additional one and a half hours of therapeutic visitation per week, clinically supervised by a psychologist. However, April E. declined to participate in this extra visitation unless her own therapist, Christine R., served as the supervisor. (Exhibit 19; Testimony of Gloria T.)
On June 19, 1999, the court (Harleston, J.) issued a fifth set of specific steps for April E., consistent with the April 1999 TPR decision. These steps repeated those previously prescribed, and added the obligation that the respondent accept and cooperate with KidSafe Parent Aide Services; submit to random drug testing; undergo individual counseling therapy with Christine R.; and participate in scheduled visitation at AMPS and at home.
April E. and Crystal, then two-and-a-half years old, participated in CT Page 16267 several visitation sessions during the early summer of 1999, under the supervision of AMPS staff-members who were skilled supervisors of parent-child interactions. At that time, it was apparent that while April E. displayed some nascent parenting skills, she lacked a valid understanding of Crystal's developmental level. April E.'s lack of insight into the pre-schooler's social needs impeded her ability to form an emotional connection with Crystal, and the child did not then regard her as a parenting figure. (Exhibit 28; Testimony of Ann T.)
On July 20, 1999, April E. was arrested pursuant to a warrant, and charged with two counts of sale of a controlled substance, in violation of General Statutes § 21a-177 (b) and two counts of possession of marijuana, in violation of General Statutes § 21a-279 (c), all related to her drug sales in January 1999.[17] She was held in lieu of bond from that date until September 29, 1999, when she voluntarily pled guilty to two felony counts of sale of a controlled substance and one count of violation of probation, receiving an agreed-upon total effective sentence of forty-two months to serve.[18] (Exhibit 5a.; Testimony of Leslie C.)
From the commencement of her incarceration at York Correctional Center (YCC) upon her arrest in July 1999, through the end of November 1999, April E. was held in segregation from other prisoners[19] and was limited in her access to DOC facilities. (Exhibit S; Testimony of Kathy T., April E.) Several times during this period, April E. intentionally misled the correctional officers into believing that she planned to harm herself, for the sole purpose of gaining temporary release from her cell.[20] (Testimony of Kathy T., April E.) While in segregation, April E. earned her GED, received individualized counseling, and underwent training about cultural, gang awareness and relationship issues. (Exhibits KK, P, Q, R.) April E. renounced her relationship to a gang in order to gain the privilege of being housed in the general population. (Testimony of Julie D., Kathy T.)
On August 5, 1999, while April E.'s drug charges were pending, the court (Munro, J.) imposed the sixth set of specific steps for April E. These steps restated the gravamen of the earlier reunification criteria,[21] and specifically ordered that April E.: could continue individual counseling with Christine R. after release from incarceration; would comply with the conditions of probation or parole; and would execute releases authorizing DCF to communicate with service providers, including DOC, concerning April's place of residence, the nature of any treatment, restrictions, services provided, utilized, attendance and progress. (Exhibits NN, OO.)
On August 9, 1999, a hearing was held to confirm the nature and extent CT Page 16268 of visitation DCF was expected to provide for April E. and Crystal, given the respondent mother's newly incarcerated status. After hearing, the court (Harleston, J.) ordered that visitation between April E. and Crystal take place on a once-monthly basis, in the company of the twins, during her confinement, with an additional monthly visit for the twins alone. (Exhibit 31; Testimony of Gloria T.)
In December 1999, April E. was placed with the general population at YCC. (Testimony of Ruthe B.) She continued her successful academic pursuits, earning some college credits, and participating in a supervised community outreach program. (Exhibits DD, RR; Testimony of Ronald F.) In late January 2000, April E. entered YCC's highly-structured substance abuse rehabilitation program, known as the Marilyn Baker House (MBH).[22]
(Exhibits J, S, GGG; Testimony of April E.) In the early part of 2000, April E. requested parenting instruction during supervised visitation. DCF met this request by providing KidSafe's services during visits. (Exhibit 26; Testimony of Gloria T.) KidSafe's services have continued without hiatus.
Prior to becoming incarcerated, April E. had only a minimal number of counseling sessions with Christine R.[23] While in DOC custody, DCF could not provide psychotherapy or other services for April E., except for visitation. (Exhibits OO, SS; Testimony of Gloria T.) However, Christine R. went to see April E. at YCC in August 1999 and spoke with the respondent by phone several times while the respondent was imprisoned.[24] (Testimony of April E.)
On November 19, 1999, the court (Harleston, J.) denied the motion to suspend visitation which had been filed by the petitioner.[25]
(Exhibits 31, 33; Testimony of Gloria T.) On February 18, 2000, the court (Harleston, J.) confirmed its August 9, 1999 order that April E. was only to visit with Crystal once a month. (Exhibit BBB.) The record does not reflect any further court action regarding the visitation schedule, nor any motions or requests for such action that were submitted for April E.[26]
 I. C. EVENTS FOLLOWING THE FILING OF THE TPR PETITION ON MAY 16, 2000
In July 2000, April E. completed her primary work with the MBH program, and was assigned to the after care division. (Exhibits J, GGG.) She received her completion certificate from the rehabilitation program on August 10, 2000. (Exhibit S.) In November 2000, the DOC transferred April E. from YCC to Quinlan Cottage, a halfway house. (Exhibits D, LLL, QQQ.) While she resided there, April E. was required to participate in weekly parenting classes and to complete substance abuse treatment. (Exhibit LLL.) In December 2000, she commenced intensive outpatient CT Page 16269 treatment at the Project Reward program, to address her self-reported ten year history of abusing alcohol and marijuana. (Exhibit XX; Testimony of Johanna H.) Project Reward Staff diagnosed April E. with dependence upon both alcohol and cannabis, although she was not actively using these substances. (Exhibit 21.) April E. remained in the Project Reward program for only a few months, and was prematurely terminated due to her unwillingness to cooperate with the program's counseling regimen.[27]
Upon discharge, April E. was referred to Connecticut Renaissance for substance abuse treatment, but she did not utilize this service. (Exhibit C-1, Testimony of Johanna H.)
April E. remained in residence at Quinlan Cottage through March 24, 2001. As a part of her discharge process, she was referred to the local Child Guidance clinic for individual counseling services.[28] Despite three counseling sessions with Pat M., April E. was unable to identify goals for her own therapy, and never formed a working relationship with the Child Guidance therapist. (Testimony of April E.)
In January 2001, April E. began working as a waitress at a local Inn 
Conference Center (the Inn). (Exhibits F, LLL.) After she left Quinlan Cottage, April E. moved into a nearby apartment which was owned by the Inn's general manager, Chris H. In compliance with the month-to-month rental terms for the apartment, April E. paid the first month's rent and a security deposit. However, she left her employment at the Inn in May, did not pay the rent due on May 15, 2001 and, at the landlord's request, vacated the premises by mid-June. (Testimony of Chris H.) In June 2001, April E. moved to a distant town, residing in an apartment with two roommates, far from her assigned therapist at Child Guidance, and far from her employment at the Inn. April E. worked at a carnival for several weeks, then resumed waitressing in her new community. She terminated her therapy with Pat M., but plans to resume regular therapy with Christine R. (Testimony of April E.)
I. D. APRIL E.'s CRIMINAL HISTORY
April E. reports having been arrested for the first time when she was twelve years old. (Exhibit 18.) In addition to the drug convictions described in Parts I. A. and B., April E. has multiple convictions for violent offenses and failure to obey court orders. In 1994, when she was seventeen and a half years old, April E. was convicted of third degree Assault. In May of 1996, months before Crystal's birth, April E. was found guilty of third degree Assault and second degree Failure to Appear. In February 1997, she was found guilty of sixth degree Larceny. In October 1997, she was again found guilty of third degree Assault and second degree Failure to Appear. In June 1998, she was found guilty of Violation of Probation and second degree Failure to Appear. In January CT Page 16270 1999, she was again found guilty of Violation of Probation. (Exhibit 5a.)
April E. will remain on parole until January 2003. (Exhibits O, LLL.)
I. E. APRIL E.'s PSYCHOLOGICAL EVALUATIONS
April E. has undergone serial psychological evaluations during the course of her involvement with DCF. As noted above, Dr. Rogers evaluated the respondent and observed her relationship with Crystal in late 1998. He found that April E. was intelligent and talented, but suffered from a personality disorder which would make it difficult for her to consistently act in Crystal's best interests.[29] Dr. Rogers found the respondent to be "in need of sustained individual psychotherapy to successfully address her apparent personality disorder." (Exhibit 3.)
In December 1999, upon referral from the court, April E. and Crystal were evaluated by Robert Meier, Ph.D., a psychologist with much skill and experience in forensic, child, and family matters. (Exhibits 22, 29.) Testing again revealed that April E. possessed traits consistent with immaturity, self-centeredness and self-indulgence, with inappropriate behaviors and choices, suspiciousness of the motives of others, hostility and anger. (Exhibit 22.)
Dr. Rogers re-evaluated April E. in January 2001.[30] He found that she had Antisocial Personality characteristics in addition to Paranoid Personality traits, and confirmed the presence of Narcissistic Personality Traits. The resulting diagnosis for April E. was Personality Disorder, Not Otherwise Specified, with Paranoid, Antisocial and Narcissistic Traits.[31] (Exhibits 4, 4b.) This condition is very difficult to treat, is not manageable through medication and is "very enduring and unlikely to change." (Testimony of Dr. Rogers.) In May 2001, at her request, April E. was evaluated by Harry Adamakos, Ph.D., a skilled and experienced psychologist whose work focuses on children, adolescents and families. (Exhibits TTT, UUU.) Like Dr. Rogers and Dr. Meier, Dr. Adamakos's testing also revealed that April E. presents with "at least a moderate level of psychopathology. . . ."[32] and suffers from a personality disorder, a condition this psychologist agreed was generally enduring and difficult to change. (Exhibit UUU.) He found that April E. continued to struggle with substance abuse issues: while she was able to admit, for example, that ingestion of alcohol was sufficient to cause a negative effect on her personality, the respondent was unwilling or unable to accept the ameliorative effects of committed abstinence.[33]
At trial, Dr. Adamakos also opined that April E. was markedly affected by a tendency to use anger and inappropriate behavior to resolve her problems. (Exhibit UUU; Testimony of Dr. Adamakos.) CT Page 16271
I. F. THE CHILD, CRYSTAL
Crystal was born on October 1996. She has been in DCF custody since April 1, 1997, when she was almost six months old, and was placed with her current foster parents, Lenore and Kevin C., on December 5, 1998.[34]
(Testimony of Gloria T., Lenore C. 3/19/99; Mother's Trial Brief.) Crystal's confusion concerning her status as a foster child has been noted by her biological mother, her foster parents, her therapists, and professional observers such as AMPS, KidSafe, and Dr. Meier. (Exhibits 4, 22, 26, 28.) To address her reported distressed behaviors and the stresses inherent in her status as a foster child, Crystal earlier received individual counseling from Ellen B., a psychotherapist, and now is under the care of Dr. Eve P., a clinical psychologist. (Exhibits U, W; Testimony of Dr. Eve P., Donyale P. 3/17/99.)
 II. ADJUDICATION
For the adjudicatory phase of these proceedings,[35] the court considered the evidence related to circumstances and events prior to May 16, 2000, the date upon which the pending TPR petition was filed, insofar as the allegation pertaining to lack of an ongoing parent-child relationship is concerned. Practice Book Sec. 33-3 (a). With regard to the allegation that April E. has failed to achieve rehabilitation, the court also considered the evidence related to events occurring through the close of trial.[36] Upon review, as discussed below, the court determines that statutory grounds for termination of April E.'s parental rights have been proved to exist.
II. A. LOCATION AND REUNIFICATION EFFORTS
Several aspects of the evidence support the conclusion that the petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts were made to reunify April E. with Crystal, consistent with General Statutes § 17a-112 (c)(1).[37] As found in Part I. B., following the issuance of the April 1999 TPR decision, DCF proffered an enhanced schedule of therapeutic visitation, including clinically supervised visitation sessions, in addition to visitation at AMPS and at April E.'s home. Unfortunately, April E. rejected the valuable opportunity for one-on-one parenting instruction by a psychologist. She unreasonably insisted that her own treating therapist should serve as a visitation supervisor, and thus lost the corollary additional time that would have been spent with Crystal. As found in Part II. B., April E.'s July 1999 incarceration effectively vitiated any positive effect that could have resulted from the older court orders for increased visitation: as set forth in Part I. B., the August 9, 1999 CT Page 16272 court order expressly limited visits to once a month while April E. was imprisoned. During her incarceration, there was little that DCF could offer, by way of reunification efforts, other than to provide visitation services.[38]
Furthermore, as found in Part I. E., DCF has diligently obtained a series of psychological evaluations for April E., and ". . . repeatedly attempted to determine what the [respondent's] mental health issues were and how best to address [her] problems." In re Ashley S.,61 Conn. App. 658, 660, ___ A.2d ___, cert. denied, 255 Conn. 950, ___ A.2d ___ (2001). However, April E. rejected the appropriate psychotherapy at the IOL that was offered to her in 1999 in response to Dr. Rogers's recommendation, electing instead to obtain alternative counseling from Christine R. In addition, the evidence reflects that since 1997 DCF had been recommending anger management treatment for April E., referring her to appropriate programs, and that the respondent was aware of these referrals.[39] (Testimony of Donyale P. 3/15/99 and 3/17/99, Sandra Z. 3/17/99.) Although DCF was unable to provide counseling or parenting services for April E. while she was serving her sentence, this resourceful respondent actually received counseling and rehabilitative services from the DOC, through the individual therapy provided while she was held in segregation, and through her participation in the multi-faceted MBH program. After April E. was discharged from YCC, she was tendered parenting education and appropriate counseling services through Quinlan Cottage, Project Reward, and Pat M. at Child Guidance. The respondent has offered no basis, in law or reason, for requiring DCF to duplicate counseling or parenting education services that are provided through DOC. Under the totality of the circumstances presented by this case, the court concludes that DCF provided reasonable efforts at reunifying April E. and her daughter.
April E. insistently opposes the conclusion that reasonable reunification efforts were extended to her with regard to Crystal.[40]
Generally, she asserts that DCF unreasonably chose to disregard the treatment plan which had been created prior to April E.'s incarceration, and which called for DCF to provide her with intensive parenting education and visitation. It is true that mother-and-child services, including visitation, were restricted once April E. was incarcerated. Otherwise, April E.'s argument must fail, as it fundamentally disregards the crucial implications of the court's visitation order entered on August 9, 1999: in responding to April E.'s incarceration by ordering that visitation should be limited to a once-monthly schedule, the court effectively held that an intensive level of reunification efforts, feasible while the respondent was at liberty, was not reasonable while she was serving her sentence.[41]
CT Page 16273
In an effort to establish that DCF failed to provide appropriate reunification efforts, April E. specifically claims that while she was incarcerated, the agency unreasonably attempted to restrict her access to Crystal. As an example of this interference, she emphasizes DCF's unilateral decision to reduce visitation following her arrest in July 1999. As previously discussed, DCF's action in this regard was effectively ratified when the August 9, 1999 order for monthly visitation was entered, supplanting the earlier orders which afforded more frequent visitation: the court can discern no measurable harm that resulted from DCF's adoption of a course of action that was effectively ratified by the court within a few weeks. (Exhibit 31.) April E. also argues that while she was imprisoned, DCF unreasonably attempted to have visitation efforts terminated. As noted in Part I. B., the petitioner's motion was directly supported by the opinion proffered by the child's therapist, a circumstance which enervates any effort to attribute to DCF an unreasonable attempt to intervene in the parent-child relationship. Again, as the court denied this motion, no deleterious effect upon the reunification process can be attributed to DCF.[42]
April E. also specifically asserts that DCF unreasonably failed to utilize all available visitation opportunities at YCC. She complains, for instance, that DCF delayed for two months in responding to the requests for services and visitation that her prison counselor, Ruthe B., had submitted in August 1999. The court finds, however, that any delay in DCF's provision of services largely coincided with April E.'s segregated status at YCC, and that these services could not be accessed until she entered the general prison population in December 1999. (Testimony of Ruthe B.) April E. further argues that DCF unreasonably refused to use DOC facilities that were, in her opinion, best suited to visitation with her daughter. However, the evidence reveals that DCF made the decision to utilize an alternative location for visitation based upon KidSafe's reasonable request that visits take place in an area that was more hygienic than the location selected by April E. (Testimony of Beverly H.) In addition, DCF's decisions in the fall of 1999 and in early 2000, that visitation opportunities should not be expanded, and that four-hour visits or overnight stays for Crystal at the prison should not be sanctioned, were rationally related to several obvious factors, including the child's therapist's recommendation against any increased contact, reports that Crystal had behavioral difficulties before and after contact with her mother, and the operative court order from August 9, 1999, which strictly limited visits. (Exhibits V, 31; Testimony of Ruthe B.) While April furthermore submits that DCF unreasonably deprived her of the opportunity for phone contact with her very young daughter, the evidence also reflects that this restriction was rationally related to DCF's reasonable reliance upon the recommendation of Crystal's therapist.[43]
CT Page 16274
April E. further claims that DCF failed to make reasonable reunification efforts because the agency did not timely respond to her inquiries about issues such as Crystal's status, or the foster parents' interest in adoption. In contrast, however, the evidence reflects that the respondent's questions were answered by the social workers assigned to her case, albeit DCF more often communicated orally, and not in writing.[44] (Exhibit PPP; Testimony of Gloria T., Marcy W.) April E. also contends that while she was incarcerated, she specifically requested supervised parenting instruction to be provided during visitation, and that DCF withheld this valuable service for an unreasonable period of time. However, as found in Part I. B., DCF provided KidSafe services to meet the respondent's needs, within a time frame that was not excessive or unduly burdensome to April E.
April E. further protests that DCF and the Vernon Police Department together secured her arrest in July of 1999, in apparent retribution for her unwillingness to work as a confidential informant in drug-related matters: April E. argues that by causing the warrant to be served at that time, DCF and the police effectively subverted the newly issued court orders for increased reunification efforts. April E. may, indeed, have been previously arrested on the premises of a local police department, where she had gone at DCF's request. (Testimony of April E., Roxanne D. 3/15/99.) Vernon police officers may, in fact, have importuned her to assist them in building cases against other drug dealers. (Testimony of David O., April E., Matthew G.) However, there is insufficient evidence to support a finding that DCF or the police engaged in unlawful or unreasonable acts in relation to April E. or her July 1999 arrest. (See Exhibit OO.) Viewed as a whole, the evidence fails to disclose any aspect of DCF's relationship with any law enforcement agency that rendered unreasonable the reunification efforts extended in this case.
April E. suggests that although DCF knew that she needed psychotherapy as early as January 1999, the agency unreasonably delayed in providing this service for her. However, the evidence clearly and convincingly compels the contrary conclusion. As found in Part I. A., DCF followed Dr. Rogers's recommendation and timely referred April E. to the Institute of Living, a facility where she could obtain appropriate psychotherapeutic services. April E. rejected the proffer of IOL treatment, instead selecting Christine R., whom she preferred as a therapist. (Exhibit 22.) In providing treatment to April E. in 1999, Christine R. focused on changing the respondent's behavior patterns, rather than dealing with the underlying personality traits that led the respondent to repeatedly make poor judgments, resort to anger and take rash actions.[45] (Testimony of Christine R.) However, as April E. did not provide DCF with the authority to communicate with Christine R. concerning the nature and extent of counseling services being provided, CT Page 16275 the agency was effectively prevented from discerning whether appropriate psychotherapy was being delivered to the respondent. Also, as noted above, while April E. was confined at YCC, it was reasonable for DCF to presume that the respondent was receiving appropriate counseling services by way of her individual treatment while in segregation, and through her attendance at the MBH program. Thereafter, April E. only minimally cooperated with the counseling services offered to her through Project Reward and Pat M. at Child Guidance. As noted throughout this opinion, when appropriate counseling has been tendered, the respondent has failed to accept those services: however, DCF has neither the ability nor the authority to force her to participate. In re Natalia G., 54 Conn. App. 800,806-807, 737 A.2d 506 (1999).
The evidence thus clearly and convincingly establishes that reasonable efforts at reunification were made as required by § 17a-112 (c)(1), but that due to her incarceration and her rejection of DCF's proffered psychotherapy and psychologist-supervised visitation, April E. was unable or unwilling to benefit from such efforts. In re Amelia W.,62 Conn. App. 500, 504, 772 A.2d 619 (2001). Even if these efforts were not reasonable in nature, given April E.'s extended incarceration and long-term stay at the DOC-sponsored residential program at Quinlan Cottage, DCF is excused from using reasonable efforts to reunite mother and daughter in this matter, other than compliance with the effective visitation orders. In re Roshawn R., supra, 51 Conn. App. 56-57.
II. B. STATUTORY GROUNDS FOR TERMINATION
 II. B. 1. PARENTAL FAILURE TO REHABILITATE — § 17a-112 (c) (3)(B)
The petitioner first alleges that April E.'s parental rights should be terminated because she has failed to achieve rehabilitation within the meaning of § 17a-112 (c)(3)(B).[46] April E. counters that she has fulfilled the specific steps and is now able to care for her child. As Crystal was adjudicated neglected on September 22, 1997, the critical issue for this court is whether the respondent has achieved rehabilitation sufficient to assume a responsible role in this child's life within a reasonable period of time. Applying the requisite legal standards[47] and, construing the statute in compliance with the mandate of § 17a-112 (i),[48] the court finds this issue in favor of the petitioner.
Multiple aspects of the clear and convincing evidence in this case support the conclusion that April E. has not yet achieved that degree of rehabilitation with regard to her issues of anger, violence, and poor judgment as would encourage the belief that she could serve as an CT Page 16276 appropriate parent for Crystal at some reasonable date in the future. SeeIn re Daniel C., supra, 63 Conn. App. 354; In re Ashley S., supra,61 Conn. App. 665; In re Sarah Ann K., supra, 57 Conn. App. 448. First, the psychological evidence clearly and convincingly establishes that April E. has not achieved § 17a-112 (c)(3)(B) rehabilitation.[49]
The opinions of Dr. Rogers and Dr. Meier affirm that April E.'s behavior is negatively affected by her anxiety, depression and entrenched personality traits: these characteristics chronically lead her to make harmful judgments about her own conduct, to take unreasonable risks, to put her own needs above those of others, to form close social relationships with persons who commit crimes,[50] and to engage in criminal acts herself. Although Dr. Adamakos found no evidence of serious anxiety or depression in April E., he joined the other psychologists in opining that she suffers from a personality disorder which adversely affects her ability to function and interact with others in a responsible manner.[51] (Testimony of Dr. Adamakos.) The psychologists agree that April E.'s condition is persistent, difficult to treat and not amenable to medication, although it may respond to very intensive, long-term psychotherapy which focuses on the intrinsic causes for April E.'s problems, rather than addressing immediate practical concerns. (Testimony of Dr. Meier, Dr. Rogers, Dr. Adamakos.) The court credits Dr. Meier's testimony that an individual with April E.'s personality disorder would have to demonstrate at least one year of lawful functioning in the community, independent of supervision by the DOC or any other agency, before one could reasonably determine whether she can function adequately as a parent.[52] Similarly, Dr. Rogers testified that given the intractable nature of April E.'s personality disorder and her history of repeated criminal activity, the sufficiency of her rehabilitation cannot be presumed until she had spent eighteen to twenty-four months living in a lawful manner, without supervision and without taking undue risks.[53]
(Exhibits 4b, FFF; Testimony of Dr. Meier, Dr. Rogers, Dr. Rogers 4/9/99.)
Utilizing the psychologists' reliable standards, it is apparent that due to the length of the April E.'s incarceration, her subsequent residence at a supervised half-way house and her continued status as a parolee subject to DOC scrutiny, there is only a limited amount of information available for use in measuring the respondent's actual ability to abide by the law, to refrain from resorting to anger when conflicts arise, or to avoid inappropriate judgments about her partners or lifestyle. Reliable information will not be available for at least one year after April B. is freed from her parole status, and has shown her ability to live safely in the community. Thus, even though April E. may, from some vantages, be seen to have made some progress toward her rehabilitation since April of 1999, the court credits Dr. Meier's explanation that, at present, the respondent's prognosis for CT Page 16277 rehabilitation can only be seen as "guarded" because her personality disorder and self-interested behaviors are so entrenched, and have not responded to the years of services that April E. has been willing to accept.[54] (Testimony of Dr. Meier; see also Exhibit 23.)
Second, the evidence clearly and convincingly establishes that April E. is only able to consistently control her anger and demonstrate good judgment, fundamental to her rehabilitation, when she resides in a highly regimented and supervised environment.[55] As noted, such improvement, under structured circumstances, is not a reliable indicator of how an individual will perform when faced with the vagaries and demands of life in the community. (Testimony of Dr. Meier; Dr. Rogers.) April E. is clearly able to remain abstinent from drug and alcohol use, known predicates to her anger and loss of control, while she is supervised by an agency with the ability to reinforce violations, such as the DOC: but she has steadfastly refused to embrace abstinence in the future. (Testimony of Johanna H., Dr. Adamakos.) When no immediate, adverse consequences are apt to befall her, April E. is not able to appropriately prioritize her daughter's needs above her own, but chooses to attend to personal matters instead of spending precious available time interacting with her child. (Testimony of Dr. Meier, Marcy W.) As found in Part I. C., when April E. is not living in a highly controlled environment, she persists in demonstrating poor judgment, as indicated by her abrupt and unnecessary departure from a stable job; failure to make timely rent payments to maintain adequate housing; terminating sessions with Pat M., her therapist at Child Guidance; and relocating herself away from a community in which she had found work and an effective support system. In so doing, April E. demonstrated the indurated nature of her unwillingness or inability to follow through with sage advice, to cooperate with those in authority or to tolerate interpersonal conflicts.[56]
The conclusion that April E. only manifests control over her anger and refrains from errors in judgment when she resides in a sanction-based setting is demonstrated by evidence of specific episodes which occurred after her release from confinement at YCC. As found in Part I. C., even while living at the halfway house, April E. refused to cooperate with the treatment and counseling program provided through Project Reward. Her non-compliance with program rules and noted absences led to her unsuccessful discharge from the program in March of 2001, after which she irresponsibly failed to follow through with her referral to another treatment agency. (Exhibit C-1.) Moreover, on several distinct occasions during the late spring of 2001, April E. publicly displayed a lack of control over the anger or poor judgment which was reportedly kept in check while she was under direct supervision at YCC, the MBH program, or at Quinlan Cottage. For instance after April E. commenced living in her own apartment, she developed an undependable pattern of appearing late CT Page 16278 for work or missing work assignments. In contrast, while she resided at Quinlan Cottage, she consistently complied with her assigned work schedule. (Testimony of Bruce B.) At the end of May 2001, during the trial of this case, April E. abruptly quit her waitressing job, which had provided her with steady employment, after she angrily and loudly overreacted to a conflict with the restaurant management, refused to talk things over, and stormed out of the facility.[57] (Testimony of Bruce B.) In addition, when April E. was asked to move from her apartment for non-payment of rent in the Spring of 2001, she again unreasonably reacted, and became embroiled in a loud public altercation with her landlord.[58]
Thus, when not facing the rigors of immediate sanctions including the potential of return to YCC, it is clear that April E. persists in disorderly and disruptive behavior, consistent with her previously noted high level of resentment toward authority, and her unwillingness to abide by acceptable societal norms.[59] Whether the respondent had paid little heed to the lessons taught in anger management classes and parenting programs, or whether she could not recall or apply what she had learned,[60] it is clear that April E. does not yet have the willingness or ability to control her volatile temper. When confronted by stress or trying circumstances, the respondent continues to act out and make decisions in anger, without regard to the negative consequences of her actions.[61]
Of the three psychologists who examined April E., only Dr. Adamakos felt that the respondent's personality was sufficiently malleable that she could, in the future, achieve improved judgment, conduct, and control over her serious, continuing problems with anger. Dr. Adamakos attributed this conclusion to April E.'s young age, lengthy prison experience, and expressed motivation for reunification with her children. He testified that improvement could occur if April E. cooperated with long-term, appropriate psychotherapeutic treatment for her personality disorder and anger issues.[62] Even his optimism was tempered, however, by the implications of the evidence related to April E.'s demonstrations of poor judgment and angry outbursts in the Spring of 2001. (Testimony of Dr. Adamakos.) Even if April E. did start appropriate psychotherapy, this long-term process would not likely bring prompt results for April E. As Dr. Adamakos admonished: "people who demonstrate personality disorders tend to be especially resistant to therapeutic intervention due to the very nature of their psychological functioning. In this case, [April E.] is likely to resist psychological interpretation, be argumentative, and tend to rationalize and blame others for her problems. of the various elements to her personality, it is the lack of trust and anger that will likely be the largest hindrance to her improvement."(Exhibit UUU; see also Testimony of Dr. Adamakos.) CT Page 16279
April E.'s rejection of the counseling services offered by Project Reward and Child Guidance, and her escalated conflicts at work and with her landlord, provide clear examples of her suspicious, distorted view of the world, identified by Dr. Meier and Dr. Rogers as an element of her personality disorder. These events vividly portray April E.'s intractable problems with impulsivity, and provide further manifestation of her unresolved personality disorder, with the hostile, confrontational behavior that results from her inability or unwillingness to abide by reasonable indicia of authority. (See Testimony of Dr. Adamakos.)
Third, the clear and convincing evidence supports the conclusion that April E. has failed to comply, in several critical respects, with the specific steps that were assigned in an effort to guide her toward reunification with Crystal.[63] Although these steps expressly prohibited her from further involvement with the criminal justice system, as described in Part I. B., April E. violated this reasonable step through her possession and sale of drugs on two occasions in January 1999. Thereafter, upon issuance of an arrest warrant in a reasonably timely manner,[64] April E. was arrested, arraigned, held in lieu of posting bond, and placed under the supervision of the Department of Corrections. Subsequently, while the specific steps of June and August 1999 were clearly in effect, she was convicted on the sale of controlled substances charges and sentenced to serve forty-two months of correction. (Exhibit 5a.) April E.'s voluntary involvement in criminal acts, blatantly engaging in the sale of drugs, violated the probation then in effect[65] and the laws of this state mere weeks before the commencement of the first TPR trial in mid-March 1999. This criminal conduct led directly to her incarceration, separation from the child who was the avowed subject of her affection, and the diminution in the nature or quantity of services DCF could provide, including the reduced orders for visitation issued by the court in August 1999 and February 2000. Under the circumstances of this case, it cannot reasonably be found that because the criminal acts of selling drugs were committed before the issuance of the 1999 TPR decision, the present court should ignore such an obvious violation of the step which prohibited any contact with the criminal justice system.[66] In re Vincent D., supra, 65 Conn. App. 670.
Unfortunately, April E. also has not satisfied the steps' directive to obtain personal counseling: except when she was confined at YCI, the respondent paid little attention to her mental health issues. As found in Part I., April E. did not participate in the proffered psychotherapy at the IOL. Although she had specifically chosen Christine R. as her personal therapist, April E. had very few actual treatment sessions with her prior to becoming incarcerated in July 1999: she had no contact with this therapist from April 22, 1999 until June 30, 1999, and the evidence CT Page 16280 reflected no formal meetings with Christine R. after the respondent was released from YCC. (Testimony of April E.) As previously discussed, April E. did accept one-on-one counseling during her segregated confinement at YCC, and she completed the MBH counseling process that was a requisite to earning her early release from prison. However, as found in Part I. C., while she was housed at Quinlan Cottage, she failed to cooperate with counseling protocol at Project Reward, and was terminated from that program. Although April E. had commenced counseling with Pat M. at Child Guidance, she attended only three sessions, and then abandoned the counseling relationship by relocating to a distant town, without making reliable arrangements to obtain appropriate therapy in her new community. Thus, since her release from prison, April E. has twice rejected appropriate counseling that was tendered to her, but her personality disorder and attendant anger still disrupt her function.[67]
Under these circumstances, April E. cannot be found to have made any significant progress in fulfilling the specific step requiring her to follow through with individual counseling.
As to the foreseeability[68] of April E.'s ability to serve as a responsible parent for Crystal, the three psychologists provided consistent and compelling evidence that April E.'s underlying personality disorder, by its very nature, cannot be resolved within a reasonable period of time, but requires a process of psychotherapy too lengthy from the standpoint of this child. In re Amneris P., supra,66 Conn. App. 385-386. Even the psychometric testing performed in January of 2001 demonstrates that despite years of services, April E. is an individual who likes to take risks, is self-focused, and puts her own needs above those of others. These are exactly the same traits that led April E. to commit the crimes that repeatedly led her to prison, and that caused the altercations with her landlord and employment manager in the Spring of 2001. Given the persistence of these characteristics, April E. remains at high risk for again repeating the same behaviors, which confirms the likelihood that she would be unable to safely care for Crystal over the long term.[69] (Exhibit 4; Testimony of Dr. Rogers.) Furthermore, her failure to gain control over her anger and her confrontational, violent approach to conflict renders April E. an inappropriate parent for Crystal. In re Luis C., 210 Conn. 157, 167,554 A.2d 722 (1989).
It should also be noted that, as described in Part I., all three psychologists cautioned that April E. can be unreasonably manipulative, leaving the sincerity of any ostensible rehabilitative progress open to question.[70] (Exhibits 3, 4; Testimony of Dr. Rogers, Dr. Adamakos.) April E.'s manipulative capacity is equally apparent from other evidence adduced in this case, indicating that she feigned psychological distress to secure admission to the mental health unit at YCC; voluntarily CT Page 16281 renounced membership in a gang to ensure her release from segregated housing, albeit alternatively admitting and denying that she had ever been affiliated with a gang; and held herself out to be an addict to engineer her acceptance into specialized DOC programs which were specially designated for substance abusers.[71] (Exhibits 21, 22, E; Testimony of Dr. Rogers; Julie D.; Christine R.) The respondent has a pattern of callously giving teachers and counselors, such as the personnel at Rockville General Hospital's substance abuse program[72] and Ruthe B. at YCC, responses that are specifically calculated to enhance her position, and to gain advantages that might be unavailable if she told the truth:[73] she has, to serve her own inferests, even presented false statements to the court.[74] (Exhibits 2, 21.) Sadly, April E. has admitted that cooperation with the Quinlan House program was contingent on the success of her TPR proceedings, threatening: "`If they don't give me the kids back, there's no way I'll stay in the halfway house.'" (Exhibit 4; Testimony of Dr. Rogers.)
Challenging the petitioner's allegations that she has not achieved rehabilitation, April E. vociferously contends that she completed the demanding MBH program, underwent therapy with Christine R., held lawful employment and secured appropriate housing, learned to hold her anger in check and avoid violence, and is now able to resume a responsible role in Crystal's life. However sincerely raised, the respondent's submissions are overwhelmed by both the expert opinions tendered in this case, and the evidence establishing her continuing problems with anger and poor judgment. The evidence confirms that any skills April E. may have gained, purportedly enabling her to exercise appropriate restraint and to avoid anger and violence, are new, fragile, and relatively untested by empirical experience. The "psychoeducational" therapy she pursued with Christine R. failed to sufficiently identify and examine the underlying causes for April E.'s antisocial behavior and narcissistic traits, leaving the respondent without the ability to understand how these factors have affected her over time. Christine R.'s type of treatment, briefly supplied, did not fulfill the respondent's need for the long-term psychotherapy which could have addressed her underlying personality disorder. (See Testimony of Dr. Rogers.) As a result, April E. "a mental health issues remain largely unresolved, and she remains at significant risk for reversion to behaviors involving anger, domestic violence, criminal acts, and other risky conduct while living in the community, while promoting her own interests without appropriate deference to or concern for others.[75] (Testimony of Dr. Rogers, Dr. Rogers 4/9/99.)
April E. has developed some parenting skills and, in some respects, has learned to manage her own life and to function in a more appropriate manner during the two-and-a-half years since the issuance of the April 1999 TPR ruling. April E. can often interact with Crystal without CT Page 16282 focusing on herself, as she did in early summer 1999 during the AMPS visitation process and during KidSafe visits while she was at Quinlan Cottage. On some occasions, April E. has the ability to control her anger, although her temperment continues to adversely affect her ability to live peaceably in the community. (Testimony of Dr. Rogers.) However, a reasonable view of the clear and convincing evidence establishes that April E. has not evolved the fundamental changes which would enable her to serve as a reliable parent in the long term, when she is subject to the stresses and vicissitudes that are intrinsic to raising a child such as Crystal.[76] (Testimony of Dr. Rogers.) It is thus objectively apparent that April E. is not able to care for her daughter at the current time, and that she faces a lengthy period of treatment for her personality disorder before she will be safely able to do so. As the GAL has tersely commented, despite the passage of time and participation in the touted MBH program, "[April E.] has not even demonstrated that she is able to maintain a stable home or job or even to avoid angry confrontations for even a short period of time. These things are necessary before she can care for Crystal."
In sum, the clear and convincing evidence fully supports the conclusion that Crystal, who has languished so long in foster care, "should not be further burdened by having to wait for her mother to achieve the level of [rehabilitation] necessary to parent her. . . ." In re Amneris P.,
supra, 66 Conn. App. 385. Balancing the child's need for permanency against the weight of the limited degree of rehabilitation April E. has achieved, the restricted environment required for her to live lawfully without anger or violence, and the lengthy time still needed to verify rehabilitation, the court is constrained to conclude that although she has made some progress in developing a safe lifestyle and in improving her parenting skills, "those efforts were too little and too late" to benefit Crystal. (Quotation marks omitted.) In re Sheila J.,62 Conn. App. 480-481, ___ A.2d ___ (2001); see also Pamela B. v. Ment,244 Conn. 296, 314, 709 A.2d 1089. The clear and convincing evidence thus compels the conclusion that April E. was no better able "to resume the responsibilities of parenting at the time of filing the termination petition than [she] had been at the time of [her daughter's] commitment."In re Hector L., 53 Conn. App. 359, 367, 730 A.2d 106 (1999). As the clear and convincing evidence also reflects that the current degree of April E.'s rehabilitation falls short of encouraging a belief that, at some reasonably foreseeable date, she could assume a responsible position in Crystal's life, the petitioner has met her burden of proof under § 17a-112 (c)(3)(B).
 II. B. 2. LACK OF ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112 (c)(3)(D)
CT Page 16283
The petitioner next alleges that the TPR petition should be granted pursuant to General Statutes § 17a-112 (c)(3)(D),[77] as no ongoing parent-child relationship exists between April E. and Crystal, and the child's best interests will not be served by allowing additional time for such a relationship to be developed. April E. argues that her contacts with Crystal, and the child's affection for her, are sufficient to withstand any claims that the parent-child relationship has been displaced. Applying the requisite legal standards and construing the statute in compliance with the mandate of § 17a-112 (i), the court finds this matter in favor of the petitioner.
The relevant legal algorithm first requires the court to determine whether a parent-child relationship exists between April E. and Crystal.[78] In re Jonathon G., supra,63 Conn. App. 525. April E. obviously loves her daughter, and she has made a recognized effort to commemorate the child's birthdays and holidays by sending her cards, drawings and notes over the years. (Exhibits L, PP.) April E. has met, during some of their visits, some of the child's emotional needs, but she has not fulfilled any of the other relevant parenting factors in any sustained sense. Overall, the clear and convincing evidence establishes that April E.'s relationship with Crystal bears scant resemblance to that of parent and child and cannot, to any measurable degree, be equated with "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." In re Jonathon G., supra, 63 Conn. App. 525. Thus, it is clear that in this case, April E. serves as a familiar adult with whom Crystal is often comfortable spending time. The child has a visiting and biological relationship with the respondent mother, but nothing more.
Historically, April E. visited with Crystal on a relatively consistent basis during the months immediately prior to the TPR trial in March and April 1999, although her previous record of visitation was somewhat lackluster. However, after the 1999 TPR decision was issued, April E. demonstrated a limited ability or willingness to cooperate with the parenting education component of the AMPS visitation service. She refused to accept DCF's proffer of therapeutic visitation supervised by a doctorate-level psychologist, even though Crystal's therapist indicated that this was a valuable mechanism for improving the bond between mother and child. (Exhibit U, Testimony of Ann T., Gloria T.) Significantly, as noted in Part I. B., before a firm parenting bond could be established, April E. was arrested as the result of her participation in the January 1999 drug sales. As discussed in Part I. B., when the court rescinded its support of an augmented visitation schedule on August 9, 1999, mother-daughter contacts were reduced to a once monthly basis. Thus, the CT Page 16284 evidence clearly and convincingly establishes that the lack of a parent-child relationship in this case is attributable to April E.'s criminal activity in January 1999, which caused her incarceration, led to court-ordered reduction in visitation opportunities, and in effect rendered her unavailable to serve as a parent for Crystal. See In reShane P., 58 Conn. App. 234, 241, ___ A.2d ___ (2000).
In discerning the absence of a parent-child relationship, the court has considered the fact that although the child has a long history of ambivalence about seeing her biological mother, Crystal does have some positive feelings for the respondent. (Exhibit 23; Testimony of Dr. Eve P.) In re Jonathon G., supra, 63 Conn. App. 525. Crystal generally enjoys visits with April E., and is especially happy when they occur in a special setting such as a restaurant or amusement facility.[79]
(Exhibits 26a, 26b, HHH; Testimony of Marcy W.) However, it is critical to note that although this child has positive feelings for the respondent, April E. is not, in any way, recognized as a "mother figure." Again, to Crystal, April E. is a known adult companion, a visitor who does not occupy, fulfill, or have the responsibility to play any maternal roles.
The expert testimony fully supports the court's conclusion that the relationship between April E. and Crystal cannot properly be characterized as that of parent and child. At five years of age, Crystal is not capable of intellectualizing the broad notion of "motherhood" defined by § 17a-112 (c)(3)(D). Crystal's treating psychologist, Dr. Eve P., explained that the child is able to understand only that there are two females in her life who are each known by a variant of the name mommy," although the existence of this dichotomy is stressful to her.[80] She is also able to comprehend that April E. gave birth to her, and that April E. has a special place in her heart. Crystal is fully aware, however, that it is her foster mother who takes care of her every day, and who has for so many years fulfilled the ongoing parental role identified in § 17a-112 (c)(3)(D). (Testimony of Dr. Eve P.) Both Dr. Eve P. and Dr. Meier have opined that Crystal sees her foster parents as her primary parenting figures, whom she trusts to meet her needs, and who serve as the child's psychological parents" in lieu of April E.[81]
(Exhibits 22, 23; Testimony of Dr. Meier.)
April E. protests that given the limited visitation opportunities provided by DCF, she was effectively precluded from establishing the basis of an ongoing parent-child relationship.[82] However, this aspect of April E.'s argument cannot prevail, as it relies upon the erroneous assumption that DCF alone imposed the visitation schedule which has for years allowed her to have physical contact with Crystal only once per month. This court is mindful, as discussed in Parts I. B., II. A., and CT Page 16285 reviewed in Part III. A. 7., that the operative visitation schedule was expressly ratified by the court on August 9, 1999 and again in February 2000. As discussed throughout, the evidence indicates that this limited visitation protocol was never presented for reconsideration. The judicial visitation orders accordingly bear the imprimatur of reasonableness with regard to the TPR issues under consideration.
As the court has found that no parent-child relationship exists between April E. and Crystal, it must next assess whether it would be detrimental to the child's best interests to allow additional time for a parenting bond to be developed.[83] In re Jonathon G., supra, 63 Conn. App. 525. Although April E. is tenacious, and has been steadfast in her efforts to regain custody of Crystal, the court must remain cognizant of the fact that the child has been in foster care since 1997. As a direct result of her mother's criminal acts and sentence after conviction for drug offenses in 1999, Crystal has remained in placement for two additional years. Under the totality of the circumstances, it would be unreasonable to expect Crystal to wait any longer for her mother's rehabilitation, before resolution of the TPR issues is reached. (Testimony of Dr. Meier.)
The psychological evidence in this case clearly establishes that Crystal's best interests cannot be served by allowing an extension of time for the development of a parent-child relationship with April E. Crystal's current therapist, Dr. Eve P., specializes in treating children with mental health problems. (Exhibit 1.) She cogently explained that as Crystal has grown from toddlerhood into a pre-schooler, she remains confused by the persisting question of whether she will remain with her foster parents, or be returned to the care of her biological mother. Crystal suffers from anxiety, adjustment disorder with oppositional behavior, night terrors and sleep disturbances, conditions which will challenge the average parent. Crystal's particular needs require the attention of a parent who can set aside her own needs to address those of the child. In the opinion of Dr. Eve P., Crystal's current foster parents, Lenore and Kevin C., are exceptionally skilled at managing the child's emotional needs. They provide firm but calm, consistent, and loving attention without becoming angry or retributive in the face of Crystal's non-compliant or overly-clingy behavior. (Testimony of Dr. Eve P.) As Dr. Eve P. testified, Crystal's psychological profile makes it likely that any transition from her foster home to April E.'s care will cause the child to undergo a traumatic grieving experience, and will greatly exacerbate her oppositional and clingy behaviors. In addition, the psychological testimony consistently establishes that Lenore and Kevin C. serve as Crystal's psychological parents: a separation from her foster parents will put the child at risk for developing serious problems with social relations, disabling her from forming significant bonds with CT Page 16286 other friends, a spouse or children. (Testimony of Dr. Meier, Dr. Eve P.) Fortunately for Crystal, Lenore and Kevin C. wish to adopt her.[84]
The psychological evidence in this case further confirms that, as far as Crystal is concerned, permanency as soon as possible is in this child's best interests."[85] (Testimony of Dr. Meier; see also Exhibit 22; Testimony of Dr. Eve P.) The child has developed a strong, healthy bond with her foster parents, and is fully socialized in the setting represented by their home. Crystal's GAL, her attorney and her treating psychologist have all urged the court to allow her to remain in her current; placement, so that she may be adopted by her loving foster parents. In view of the questions that persist concerning April E.'s ability to serve as a responsible parent for this particular child, with manifest needs for careful attention to her emotional needs, the court must agree.
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." (Citations omitted.) In re John G.,56 Conn. App. 12, 22, 740 A.2d 496 (1999). This principle is applicable to the present case, where the clear and convincing evidence establishes that any valid parenting relationship that April E. may have developed with Crystal has been definitively lost due to the child's extended placement in foster care, which resulted from the respondent mother's own criminal acts. As the clear and convincing evidence in this case establishes that no ongoing parent-child relationship I exists between April E. and Crystal, and that it is not in Crystal's best interests to allow more time for her to develop a relationship with her biological mother, the petitioner has met her burden of proof under § 17a-112
(c)(3)(D). In re Jonathon G., supra, 63 Conn. App. 525; In re John G.,
supra, 56 Conn. App. 22.
 III. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child."[86] (Citation and quotation marks omitted.) In this dispositional phase the court has considered the evidence and testimony relevant to circumstances and events which occurred through the close of trial. Practice Book 33-5.
III. A. SEVEN STATUTORY FINDINGS
CT Page 16287
The court has made each of the seven written factual findings required by General Statutes § 17a-112 (d) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights. See In re Jonathon G., supra, 63 Conn. App. 528.
 III. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112 (d)(1)
As discussed in Parts I., II. A. and B., multiple timely and appropriate services have been provided for or offered to April E., including psychological assessments and counseling; parenting instruction and clinically supervised visitation by Dr. Neems and AMPS; supervised visitation and parenting instruction through KidSafe and DCF; transportation for visitation; and case management. (Testimony of Gloria T.) As found in Part II. A., although other than visitation, further services were not extended after July 1999, due to the commencement of April E.'s lengthy period of incarceration, April E. participated in counseling and anger management services through the DOC.
 III. A. 2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — § 17a-112 (d)(2)
As fully discussed in Part II. A., DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
III. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (d)(3)
April E. has only partially complied with the expectations and specific steps put in place by the court from April 1997 through 1999. As fully discussed in Parts I. and II. A. and B., the respondent has failed to satisfactorily complete the steps mandating personal counseling, having rejected the IOL, prematurely terminated work with Pat M. at Child Guidance, and having received only a minimal amount of professional attention from Christine R. In addition, April E. has failed to avoid further involvement with the criminal justice system, as explained above.
 III. A. 4. THE CHILD'S FEELINGS AND EMOTIONAL TIES — § 17a-112 (d)(4)
As discussed in Part II. C., Crystal considers herself to be the daughter of her foster parents, Lenore and Kevin C., whom she calls "Mommy" and "Daddy." She has been bonded to them for years, depends upon them and trusts them to meet her physical and emotional needs. (Exhibits CT Page 16288 1, 22, 23, 29; Testimony of Dr. Meier, Dr. Eve P., GAL.) Crystal is also firmly bonded to her twin brothers, who live with her at present. (Testimony of Dr. Eve P., GAL.) The child also retains affection and positive feelings for April E.; she knows her well, is comfortable with her, and enjoys their visits and time together. (Exhibits 23, MM; Testimony of GAL.) However, the evidence establishes that Crystal has long viewed April E. only as a familiar adult, but not as her parent. (Exhibits 3, 22, 23, FFF; Testimony of Dr. Meier, Dr. Eve P.) (See Part II. C.)
III. A. 5. AGE OF THE CHILD — § 17a-112 (d)(5)
Crystal was born on October 1996, and has just passed her fifth birthday.
 III. A. 6. PARENT'S EFFORTS TO ADJUST HER CIRCUMSTANCES — § 17a-112 (d)(6)
April E.'s conduct fell markedly below acceptable parental standards prior to her incarceration in July 1999, as she engaged in illegal drug sales during the previous January, even though specific steps and probation orders prohibiting such behavior were in effect. She demonstrated a lack of enthusiasm and some unwillingness to fully engage in the counseling and reunification services offered in the period between the April 1999 TPR decision and her subsequent arrest. Since her incarceration, April E. has made an effort to adjust her circumstances, engaging in study on child-related issues and generally acting within the law while residing in DOC-sponsored settings. Despite the long passage of time and opportunities for counseling, however, she has not yet learned to control her anger, and has not learned to modify her behavior so as to avoid interpersonal conflict. Giving her additional time would not likely bring her performance, as a parent, within acceptable standards sufficient to make it in Crystal's best interests to continue to await reunification. (Testimony of Dr. Meier.)
 III. A. 7. EXTENT TO WHICH PARENT WAS PREVENTED FROM MAINTAINING A RELATIONSHIP WITH THE CHILD — § 17a-112 (d)(7)
No unreasonable conduct by the child protection agency; foster parents or third parties prevented April E. from maintaining a relationship with her daughter, although the limitations and restrictions inherent in the foster care system were in effect. It is obvious that the relationship between April E. on the one hand, and DCF and the foster parents on the other, has been strained and often adversarial since the inception of the agency's involvement with Crystal in early 1997.[87] (Exhibits 4, UUU; Testimony of April E.) While April E. would have the court blame DCF for the failure of the reunification process, the evidence clearly and CT Page 16289 convincingly establishes that her own criminal acts and resultant incarceration, along with her failure to achieve rehabilitation, were the operative factors which impeded reunification and the maintenance of a parenting relationship with her daughter. (See Exhibit 22.)
April E. argues that the foster parents, with DCF cooperation, have unreasonably interfered in her relationship with Crystal. She claims, for instance, that the foster parents effectively withheld from Crystal a series of drawings and cards she had given to the child. The court finds that such drawings were available to Crystal, but that she is a busy, social five-year old who has many interests, including art work and crafts prepared by others. (Exhibit 26.) April E. is correct in asserting that, the foster parents feel that Crystal should have only written contact with her biological mother, a perception which is apparently derived from negative behavior the child has displayed in connection with visits. (Exhibit 22.) There is no evidence, however, that they have acted in any unreasonable manner to prevent visits from occurring, or prevent the mother-child relationship from being maintained. (Testimony of Dr. Meier; Dr. Eve P., Lenore C. 3/19/99.) April E. complains that her visits with Crystal were always supervised, sometimes attended by the foster mother or DCF personnel in addition to AMPS or KidSafe staff members. Seemingly in disagreement with the educational aspect of the supervised sessions, April E. refers to the parenting instruction given during such visits as "interruptions." (Testimony of April E.) Given Crystal's age and confusion about her status as a foster child, and April E.'s limited degree of rehabilitation, the court finds that such supervised visitation was appropriate and reasonable in this case.
III. B. BEST INTERESTS OF THE CHILD — § 17a-112 (c)(2)
The court is next called upon to decide whether termination of April E.'s parental rights would be in Crystal's best interests.[88] Applying the appropriate legal standards[89] to the clear and convincing facts of this case, and utilizing the best interests analysis and conclusions set forth in Part II. C., the court finds this issue in favor of the petitioner.
In finding that termination of the respondent's parental rights would be in Crystal's best interests, the court has examined multiple relevant factors including the child's interests in sustained growth, development, well-being, stability and continuity of her environment; her length of stay in foster care; the nature of her relationship with her foster parents and biological parents; the degree of contact maintained with her biological parents; and her genetic bond to April E.[90] In reAlexander C., 60 Conn. App. 555, 559, ___ A.2d ___ (2000); In re ShyinaB., 58 Conn. App. 159, 167, ___ A.2d ___ (2000); In re Savanna M., supra, CT Page 1629055 Conn. App. 816. The court has also balanced Crystal's intrinsic needs for stability and permanency against the potential benefit of maintaining a connection with her biological parent. See Pamela B. v. Ment, supra,244 Conn. 314 (child's physical and emotional well-being must be weighed against the interest in preserving family integrity). Under such scrutiny, the clear and convincing evidence in this matter establishes that it is not in Crystal's best interests to continue to maintain a legal relationship with April E.
In deciding this issue, the court has remained mindful that, as found in Parts II. B. and C., April E. continues to face her own challenges. While she has been able to find employment and housing, the respondent's future status is dependent upon her ability to develop control over her anger, a skill which has eluded her despite years of interventions, and her ability to avoid further incarceration. As Dr. Adamakos has noted, April E.'s aggression and violent behavior are triggered by alcohol use: forebodingly, the respondent has been unwilling to commit to a life of abstinence after she is released from DOC supervision.[91] (Exhibit UUU.) In addition, April E.'s long criminal history commenced prior to Crystal's birth in 1996. Her criminal activity continued after neglect and TPR proceedings had been filed, and still occurred while the respondent was awaiting the first TPR trial. This behavior is consistent with April E.'s results from the psychological tests which revealed her enduring high degree of self-interestedness. (Exhibit FFF; see also Part II. B.) The court credits Dr. Meier's psychological opinion that as far as April E. is concerned, "[t]he best predictor of future behavior is still what has happened in the past."[92] (Testimony of Dr. Meier; see also Exhibit 22.) Noting April E.'s failure to fully respond to treatment for her incipient anger and impulsivity, the court is constrained to conclude that any child in her care will be exposed to irresponsible or unlawful behavior, which would clearly be detrimental to Crystal's best interests.
Given the evidence reflecting April E.'s continuing, intractable problems with anger and I self-control, despite her ostensible treatment for these issues, the court concludes that the I respondent is fundamentally incapable of meeting Crystal's specialized needs. Although April E. has taken parenting and child development classes, she has no realistic appreciation for her child's high degree of anxiety or adjustment disorder, and has not developed a functional plan for properly dealing with Crystal's emotional and behavioral demands if the child returns to her care.[93] Contrasted with the care and attention that Crystal receives from Lenore and Kevin C., the evidence does not reasonably permit the court to draw the inference that April E. is capable of dealing with Crystal's emotional issues in a healthy manner: it is more likely that this respondent would respond to child-related CT Page 16291 stress by losing her temper and her self-control, as was evident in her difficulties experienced at work and with her landlord. As Crystal's GAL has argued, the child's best interests will be met by permitting her to remain in the home where she is so comfortable, so well cared for, and where her oppositional behavior is so deftly managed.[94]
As fully discussed in Part II. C., the psychological evidence in this case establishes that Crystal's best interests will best be met by the termination of April E.'s parental rights. This action will allow Crystal to remain, on a permanent basis, with Lenore and Kevin C., in whose safe, secure home she has lived since December 1998, and with whom she has developed strong emotional ties. Crystal is now five years old: although the evidence disclosed that she is fond of her biological mother, Crystal has been out of April E.'s care since April of 1997. Our courts have recognized that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to their permanent or temporary care. In re Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930
(1992); see also In re Juvenile Appeal (84-CD), 189 Conn. 276, 292,455 A.2d 1313 (1983). The court is constrained to agree with Crystal's attorney and GAL, and, based upon the clear and convincing evidence in this case finds that Crystal is entitled to the benefit of ending, without further delay, the long period of uncertainty as to the availability of April E. to serve as her functional parent, by terminating the respondent's parental rights.
It is clear that April E. loves her child and wants her parental rights maintained.[95] (See Exhibit M.) Under the circumstances of this case, however, "[a] parent's love and biological connection . . . is simply not enough. [The department] has demonstrated by clear and convincing evidence that [the respondent] cannot be a competent parent to [Crystal] because she cannot provide [her] a nurturing, safe and structured environment." (Citations and quotation marks omitted.) In re Ashley S.,
supra, 61 Conn. App. 667; see also In re Eden F., supra, 250 Conn., 707-708; In re Deana E.,61 Conn. App. 195. The court sympathizes with April E. and notes her vigorous defense of this matter. In re Ashley S.,
supra, 61 Conn. App. 667. However, having balanced Crystal's intrinsic need for stability and permanency against the benefits of maintaining a legal connection with April E., the clear and convincing evidence in this case establishes that the child at issue is entitled to the benefit of ending, without further delay, the uncertainty of the issues raised through this litigation.
Accordingly, with respect to the best interests of the child contemplated by § 17a-112 (c)(2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence CT Page 16292 presented, the court finds that termination of the parental rights of April E. is in the best interest of the child Crystal E.
 V. ORDER OF TERMINATION
WHEREFORE, after due consideration of the child's sense of time, her need for a secure and permanent environment, the relationship she has with her foster parents, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the child's best interests, the court issues the following ORDERS:
That the parental rights of April E. are hereby terminated as to the child Crystal E.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Crystal E. for the purpose of securing an adoptive family or other permanent placement for the child.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court as required by law. That primary consideration for adoption of Crystal E. shall be offered to her current foster parents, Lenore and Kevin C.
BY THE COURT,
N. Rubinow, J.